WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

By:   JOSEPH J. BRANCO (031474)
      CHARLES TRULLINGER (018936)
      TALIA J. OFFORD (028768)
      Deputy County Attorneys
      brancoj@mcao.maricopa.gov
      trullinc@mcao.maricopa.gov
      offordt@mcao.maricopa.gov

CIVIL SERVICES DIVISION
Security Center Building
222 North Central Avenue, Suite 1100
Phoenix, Arizona  85004
Telephone (602) 506-8541
Facsimile (602) 506-8567
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 00032000

Attorneys for Defendants Maricopa
County, Sheriff Paul Penzone, and the
Individually-Named Detention Personnel

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Edward Byrd,<br><br><br>               Plaintiff,<br><br>v.<br><br>Maricopa County Board of<br>Supervisors, et. al.,<br><br>               Defendants. | No. CV 14-2656-PHX-DMF<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Hon. Deborah M. Fine)<br><br>**(Oral Argument Requested)** |

1

2

**Table of Contents**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Routine security walks promote inmate safety and institutional security. . . . . . . . 1

II.     The MCSO affords inmates privacy safeguards. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    Opposite-sex observation and Byrd's use of the shower and toilet. . . . . . . . . . . . 2

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Defendants did not violate Byrd's federal rights. . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.      Defendants did not violate Byrd's right to equal protection [Count 1]. . . . . . . 4

    B.      Defendants did not violate Byrd's 4th Amendment right [Count 2]. . . . . . . . . 6

        1.      Byrd was not searched. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.      The challenged observation did not violate the 4th Amendment. . . . . . . . 7

            a)      The challenged observation is reasonable under *Bell*. . . . . . . . . . . . . . 7

            b)      The challenged observation is valid under *Turner*. . . . . . . . . . . . . . . . 10

    C.      Defendants did not violate Byrd's 14th Amendment right to privacy
            [Count 3]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.      If observation is a 4th Amendment "search," then the 14th Amendment's
                right to privacy is inapplicable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.      The challenged observation did not violate Byrd's 14th Amendment
                right to privacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.      Defendants did not punish Byrd under the 14th Amendment [Count 4]. . . . . . 14

    E.      Byrd has no additional substantive due process claim [Count 5]. . . . . . . . . . 15

    F.      Byrd's derivative § 1985(3) and § 1986 claims fail [Counts 6 and 7]. . . . . . . 15

    G.      Even if the MCSO's policy violated Byrd's federal rights, the individual
            defendants are entitled to summary judgment [Counts 1–7]. . . . . . . . . . . . . . 16

        1.      The individual defendants are entitled to qualified immunity. . . . . . . . . . 16

2.   Byrd cannot show that the individually-named officer defendants personally participated in the violation of his rights. . . . . . . . . . . . . . . . . 18

II.   Defendants did not violate Arizona law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.   Byrd's state law claims against the County and the Sheriff fail. . . . . . . . . . . 19

        1.   Byrd cannot maintain state law claims against the County for alleged violations by the Sheriff and his employees. . . . . . . . . . . . . . . . . . . . . . . 19

        2.   Sheriff Penzone is entitled to absolute immunity under A.R.S. § 12-820.01(A)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        3.   The individual defendants are entitled to qualified immunity for any operational decisions, precluding the Sheriff's derivative liability. . . . . . 21

    B.   Byrd's state constitutional claims fail [Counts 8–11]. . . . . . . . . . . . . . . . . . . 22

        1.   Byrd cannot bring a private cause of action for alleged violations of Article II, Sections 4, 8, 13, and 15 of the Arizona Constitution. . . . . . . 22

        2.   Defendants did not violate the Equal Privileges Clause [Count 8]. . . . . . 23

        3.   Defendants did not violate the Right to Privacy Clause [Count 9]. . . . . . 23

        4.   Defendants did not violate the Cruel and Unusual Punishment Clause [Count 10]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        5.   Defendants did not violate the Due Process Clause [Count 11]. . . . . . . . 25

    C.   Byrd cannot maintain his state law tort claims [Counts 12–15]. . . . . . . . . . . 25

        1.   Byrd has no claim for negligence [Count 12]. . . . . . . . . . . . . . . . . . . . . . 25

        2.   Defendants did not commit Intentional Infliction of Emotional Distress [Count 13]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        3.   Defendants did not enter a civil conspiracy [Count 14]. . . . . . . . . . . . . . 27

        4.   Defendants did not aid and abet tortious conduct [Count 15]. . . . . . . . . . 27

III.   Byrd cannot obtain all the relief he seeks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    A.   Byrd's injunctive relief claims are moot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    B.   Punitive damages are unavailable to Byrd. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Combined Motion for Summary Judgment

Pursuant to Fed. R. Civ. P. 56(a), Defendants Maricopa County, Sheriff Paul Penzone, and the individually-named detention officers[1] ("Defendants") jointly move for summary judgment on Plaintiff Byrd's claims asserted against them in his Fifth Amended Complaint. (Doc. 102).

## Statement of Facts[2]

Plaintiff Charles Byrd was in the custody of the Maricopa County Sheriff's Office ("MCSO") from May through October 2014, when he was released to the Arizona Department of Corrections. (Separate Statement of Facts ("SSF") 6). Byrd was housed in the 3F2 Pod ("Three Frank") at MCSO's Fourth Avenue Jail ("Jail"). (*Id.*).

## I.      Routine security walks promote inmate safety and institutional security.

MCSO detention officers conduct routine security walks in MCSO jail facilities for inmate safety and institutional security. (SSF 23). During a security walk, officers start outside the housing unit, enter to conduct the walk, and exit. (SSF 22). At Three Frank, security walks occur roughly every 25 minutes and typically last a few minutes. (SSF 21–22). During a security walk, officers meet inmate needs, visually check the housing unit, including the shower areas and cells, and visually observe inmates. (SSF 19–20). If an inmate is showering or using the toilet, the officer briefly observes the inmate to confirm the inmate's safety. (SSF 23–24, 27, 29). If there is a shower curtain, it may be necessary

---

[1]   Defendants Ofc. Lauren Crone, Ofc. Annette Moran, Sgt. Jennifer Fisher (formerly Hernandez), Ofc. Danyll Hooks, Ofc. Bernadette Barron, Ofc. Ruth Rodriguez, Capt. Ansel Harmon, Lt. Ernest Alcala, Lt. Robert Beyerle, Sgt. John Bedome, Sgt. William Drake, Sgt. Guadelupe Sanchez, Sgt. Peter Renik, Sgt. Adrian Dominguez, Sgt. Peter Corpus, Sgt. Danny Vazquez, Sgt. Ian Quaranta, Sgt. Gregory Down, Ofc. Michael Miranda, Ofc. Estefana Calderon (formerly Serna), Ofc. Robert Dunn, Ofc. Phillip Asiedu-Darkwa, Ofc. Elian Griego, Ofc. Dang Nguyen, Ofc. Keith Lee, Ofc. Epimenio Quintana, Ofc. Jeffery Schroeder, Sgt. Jeremy York, Sgt. Christopher Terracino, Sgt. Katherina Brokschmidt, Sgt. Christopher King, Sgt. Anthony Brandt, Sgt. Lance Britain, Sgt. Deana Wierschem (formerly Lopez), Sgt. Danny Vazquez, Sgt. Ian Quaranta, Sgt. Gregory Down, and Lt. Kevin Cochrane.

[2]   Consistent with LRCiv. 56.1(a), all defendants filed a combined Separate Statement of Facts in support of their Motions.

for the officer to look behind the curtain to confirm safety and security. (SSF 64).

## II.      The MCSO affords inmates privacy safeguards.

Officers of both sexes conduct security walks. (*See* SSF 29, 96). Before an opposite-sex officer enters a housing unit, inmates are advised by an announcement that an officer of the opposite sex will be entering. (SSF 25, 70, 97). The purpose of the announcement is to let inmates cover themselves or leave the shower area. (SSF 22).

For privacy during a shower, an inmate can cover himself, wear his underwear, wrap himself in a towel, stand behind a privacy wall, and/or leave the shower area. (SSF 26, 30, 56, 58, 70, 80–82). Beginning June 2018, male inmates in the Towers and Durango Jails and female inmates in the Estrella Jail can shower behind shower curtains. (SSF 67, 101–102). Three Frank does not have shower curtains. (SSF 60). Three Frank houses maximum security inmates, who are among the MCSO's most dangerous inmates. (SSF 19, 105). The Towers and Durango Jails do not house maximum security inmates. (SSF 63, 67). The Estrella Jail houses maximum security and lower security inmates. (SSF 94). The shower curtains at Estrella Jail protect female inmates from exposing their breasts to the officers in the tower. (SSF 65, 101). For privacy while using the toilet, an inmate can cover his genitals with a towel and/or a sheet. (SSF 51). An inmate can shower and use the toilet in between routine security walks. (*See* SSF 32, 99).

## III.     Opposite-sex observation and Byrd's use of the shower and toilet.

Byrd used the downstairs shower area approximately 10 feet from his cell. (SSF 55, 57). That shower area was enclosed by three walls and an approximately 4-foot high "privacy wall." (*See* SSF 55–56, 79). The common area was visible to the shower, beyond the privacy wall and the stairs. (*See* SSF 20). Byrd could see the "slider"—Three Frank's entry door—from the shower area, and Byrd could tell whether there was a person at the slider. (SSF 90). Typically, an officer would begin the security walk at Cell 1 and check cells until reaching Cell 18, approximately 10 fee from the showerheads, and then go up the stairs. (SSF 22, 57). When an officer went up the grated metal stairs the shower area could be seen with the view obscured by the stairs. (SSF 75–76). During shower and toilet

use, inmates in Three Frank had privacy safeguards available to them. (SSF 26, 30, 32, 51, 56, 58, 70, 80–82).

Byrd claims female officers saw him when he used the shower and the toilet. (SSF 47–50, 53–54, 77–78). Officers did not order Byrd to (a) shower, (b) take his clothes off, or (c) manipulate his body for viewing. (SSF 36). Byrd did not cover himself when he showered. (SSF 82, 91). Byrd stated he did not cover himself with a towel because "[y]ou cover yourself with a towel, your towel is going to get all wet, and you got nothing to dry on." (SSF 91). Byrd did not cover himself when he used the toilet. (SSF 51–52).

Byrd claims he submitted five grievances complaining about the opposite-sex observation. (SSF 114–19). Byrd claims he has a heightened sensitivity to opposite-sex observation because of a past history of sexual trauma. (SSF 2).

## Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In its analysis, the court must believe the nonmovant's evidence and draw all reasonable inferences in the nonmovant's favor. *Id.* at 255.

## Argument

Byrd challenges female detention officer observation of him while he showered and used the toilet in Three Frank. (Doc. 102, ¶¶ 5, 19–20). Byrd alleges municipal and individual liability. (*Id.*, ¶¶ 2–9).

To establish 42 U.S.C. § 1983 municipal liability based on a policy, practice, or custom, a plaintiff must show that: (1) he was deprived of a constitutional right; (2) the

municipality had a policy, practice, or custom; (3) the policy, practice, or custom was deliberately indifferent to his constitutional right; and (4) the policy, practice, or custom was the moving force behind the constitutional violation. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). Individual defendant "[l]iability under section 1983 arises only upon a showing of personal participation." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Id.* A plaintiff's state law claims are governed by relevant state precedent. *See, e.g.*, *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1060–67 (D. Ariz. 2012).

**I.     Defendants did not violate Byrd's federal rights.**

**A.     Defendants did not violate Byrd's right to equal protection [Count 1].**

Byrd alleges that Defendants violated his right to equal protection because male inmates were subject to opposite-sex observation while female inmates were not. (Doc. 102, ¶¶ 84–125). To show a claim of unconstitutional discrimination, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005). "Mere indifference to the effects of a decision on a particular class does not give rise to an equal protection claim." *Id.* at 1167.

If a classification treats men differently, it requires a "substantial relationship" to "important governmental objectives." *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981). This framework permits "gender classification [that] is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Id.* Lawful discrimination may "provide for the special problems of women," id., and take into account the "[p]hysical differences between men and women," *United States v. Virginia*, 518 U.S. 515, 533 (1996). The "relevant inquiry . . . is not whether the [decision] is drawn as precisely as it might have been, but whether the line is chosen . . . within constitutional limitations." *Michael M.*, 450 U.S. at 473.

Here, Defendants treated male and female inmates the same. Officers conducted

4

security walks for inmate safety and institutional security. (SSF 23, 95). Male and female inmates may be subject to opposite-sex observation incident to security walks. (SSF 29, 96). Security walks were brief in nature and conducted every twenty-five minutes. (SSF 21–22, 99). Officers observed areas and inmates in the housing unit, and may observe inmates in the shower area and cells where inmates may be naked, but officers did not conduct prolonged inspections. (SSF 23–24, 27, 29, 96–98).

The MCSO afforded male and female inmates numerous privacy safeguards. The MCSO announced the presence of opposite-sex officers before they entered a housing unit. (SSF 25, 70, 97). For privacy during a shower, inmates could cover themselves, wear underwear, wrap themselves in a towel, and/or leave the shower area. (SSF 26, 30, 58, 70, 80–82, 98, 100). Male inmates in Three Frank could also stand behind a 4-foot high privacy wall. (SSF 56). For privacy during toilet use, inmates could cover their laps with a towel and/or a sheet. (SSF 51). Inmates could time their showers or toilet use to avoid security walks. (SSF 32, 99). These safeguards permit inmates to "shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex." *See Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985). There was no discrimination, because these safeguards were available to male and female inmates.

Beginning in June 2018, in addition to these methods of privacy, lower security male inmates at the Towers and Durango Jails and female inmates in Estrella Jail may use shower curtains; there was no shower curtain in Three Frank. (SSF 60, 67, 101–102). Aside from classification levels, the difference was supported by the difference in male and female anatomy: the shower curtains protected maximum security female inmates from exposing their breasts to control tower officers. (SSF 65, 101). The provision of shower curtains in the Towers and Durango Jails belies any claim of sex discrimination.

Such a difference between Three Frank and Estrella Jail was not "invidious" discrimination because (a) all inmates were afforded numerous privacy safeguards, (b) the later-added shower curtains in Estrella reflected the MCSO's delicate balance between inmate safety and institutional security and inmate privacy to address a special problem

for women, and (c) male inmates who posed less security threat received shower curtains. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Further, the shower curtains were not added until June 2018 after Byrd left MCSO custody. There was no discriminatory intent. The Court should grant summary judgment on Count 1.

### B. Defendants did not violate Byrd's 4th Amendment right [Count 2].

Byrd alleges the opposite-sex observation violated his 4th Amendment right. (Doc. 120, ¶¶ 126–72). "A right to privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984). "[A]ny reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope." *Bell*, 441 U.S. at 557.

### 1. Byrd was not searched.

As a threshold matter, Byrd's 4th Amendment claim fails because he cannot claim visual observation is a "search." The Ninth Circuit has "[a]ssum[ed]" that officers' observations of inmates in shower areas and cells "are 'searches' for the purposes of the fourth amendment." *Grummett*, 779 F.2d at 495. But the Supreme Court has "held that visual observation is no 'search' at all." *Kyllo v. United States*, 533 U.S. 27, 32 (2001). Further, any challenged observation occurred because Byrd failed to use privacy safeguards afforded under MCSO policy. (*See* SSF 26, 30, 32, 51–52, 56, 58, 70, 80–82, 91). Just as "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares," *Kyllo*, 533 U.S. at 32, it does not require female officers to shield their eyes during a security walk when male inmates are naked. The Court should grant summary judgment on Count 2.

**2.       The challenged observation did not violate the 4th Amendment.**

Assuming without conceding that observation is a search, the challenged observation satisfies the reasonableness standards under *Bell* and *Turner v. Safely*, 482 U.S. 78 (1987).[3]

**a)       The challenged observation is reasonable under *Bell*.**

In evaluating whether a particular search was reasonable under *Bell*, the court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559.

Examining the scope and manner of the opposite-sex observation, in *Grummett*, male prisoners challenged the constitutionality of surveillance performed by female guards. 779 F.2d at 493–95. The showers in *Grummett* had solid walls and bars at the front. *Id.* at 492. Male guards escorted inmates to the showers and "lock[ed] them inside." *Id.* Guards conducted periodic patrols day and night to make sure that inmates were in their cells and following prison regulations. *Id.* The showers could be seen from the tiers where female guards patrolled. *Id.* While female guards could see into cells when on patrol, they did "not stop for prolonged inspection." *Id.* Female guards were not stationed in positions that required close and prolonged surveillance of disrobed inmates. *Id.* at 495. In upholding the opposite-sex observation, the Ninth Circuit concluded that the circumstances were not "so degrading as to require intervention" because opposite-sex viewing of the inmates was infrequent, casual, or at a distance. *Id.* at 494–95.

In *Michenfelder v. Sumner*, prisoners challenged the use of female officers for "shower duty." 860 F.2d 328, 333 (9th Cir. 1988). The issue was whether "female officers regularly or frequently observe unclothed inmates without a legitimate reason for doing so." *Id.* at 334. The Ninth Circuit upheld the use of female officers in "shower duty"

---

[3]  Byrd's Complaint extensively references Prison Rape Elimination ("PREA") regulations. (Doc. 102, ¶¶ 32–42). "[D]istrict courts nationwide have found that the PREA does not create a private cause of action . . . ." *Hatcher v. Harrington*, No. 14-00554 JMS/KSC, 2015 WL 474313, at \*5 (D. Haw. Feb. 5, 2015).

because the evidence "did not establish an inappropriate amount of contact with disrobed prisoners." *Id.*; *see also Somers v. Thurman*, 109 F.3d 614, 620 (9th Cir. 1997) (stating that Ninth Circuit never "held that guards of the opposite sex are forbidden from viewing showering inmates"). Neither *Grummet* nor *Michenfelder* addressed any privacy protections afforded to inmates in their showering area or cells.

More recently, an Arizona district court judge upheld opposite-sex observation of naked male inmates incident to security walks. *Kirkpatrick v. Maricopa Cnty. Bd. of Supers.*, No. CV 16-00287-PHX-JJT (BSB) (D. Ariz. Feb. 8, 2019).[4] That court found that the observation did not violate the 4th Amendment where "the female officers briefly glanced at Plaintiff as they walked by the shower area, from a distance of approximately between 9 and 14 feet, without making physical contact with Plaintiff's body." *Id.*, at *9.

Here, the challenged opposite-sex observation was limited in scope and manner. Officers conducted security walks for inmate safety and institutional security where inmates may be subject to opposite-sex observation incident to those walks. (SSF 21–29, 41, 57). Security walks were brief in nature and conducted every twenty-five minutes. (*Id.*). Officers observed areas and inmates in the housing unit, and may observe inmates in the shower area and their cells where inmates may be naked, but officers did not stop for prolonged inspections. (*Id.*).

In Three Frank, the downstairs shower area had three walls and a privacy wall. (SSF 55–56, 79). The shower area could be seen from the stairs above it, with the view obscured by the stairs. (SSF 75–76). The views into the shower area from Cell 18 where officers typically stopped on the first floor were approximately 10 or more feet from the showerheads. (SSF 22, 55, 57). The shower area was open to the common area, separated by the privacy wall, and Byrd could see from the shower to Three Frank's entry door to look for someone entering Three Frank. (SSF 20, 90). Byrd's cell was directly adjacent to the shower area, and he could return there if he was uncomfortable. (*See* SSF 70, 81, 92).

---

[4]     Defendants seek judicial notice of this decision by separately filed motion.

If officers saw an inmate in the shower area or using the toilet, they glanced at him as they walked past. (SSF 29, 41, 122).

Further, the scope and manner of the challenged observation was set by Byrd through the availability of numerous privacy safeguards. MCSO announced the presence of opposite-sex officers before they entered a housing unit. (SSF 25, 70). Byrd could have timed his shower or toilet use to avoid security walks. (SSF 32). During his shower, Byrd could have covered himself, worn underwear, wrapped himself in a towel, stood behind the privacy wall, or left the shower for his nearby cell. (*See* SSF 26, 30, 32, 56, 58, 70, 80–82). Byrd stated he did not cover himself with a towel because he did not want his towel "to get wet." (SSF 91). During toilet use, Byrd could have covered his lap with a towel and/or a sheet. (SSF 51). Under the totality of the circumstances, the scope and manner of the opposite-sex visual observation incident to routine security walks was reasonable.

Turning to the justification for the search and the place to be searched, it was legitimate for an officer to observe an inmate naked incident to a security walk. Three Frank held maximum security inmates, among MCSO's most dangerous inmates, and inmates were known to fight in the shower. (SSF 19, 105). Officers must confirm that inmates in the shower area or cells do not require medical attention, are not being and were not assaulted, and are complying with jail regulations. (SSF 23). Thus, the incidental observation of a naked inmate was legitimate. *See Kirkpatrick*, No. CV 16-00287-PHX-JJT (BSB) at *9–*10 ("[T]he female officers were justified in their actions by the need to ensure that the shower areas remained safe and free from dangerous or illegal activity."). The fact that the officer observing the inmate was female does not make it illegitimate. *See Somers*, 109 F.3d at 620.

Additionally, precluding female officers from conducting security walks inside male housing units would restrict them from working in most of the MCSO's facilities. (SSF 127–30); *cf. Grummett*, 779 F.2d at 496 (adding additional requirement of no opposite-sex observation could result in "a tremendous rearrangement of work schedules,

and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards").

Byrd wrongly claims that observation of naked inmates during a security walk is a strip search in violation of MCSO policy, which would undermine its justification. (*See* Doc. 102, ¶¶ 43–58). Per MCSO policy, a strip search is "A visual scan of the inmate's body after all clothing has been removed. The clothing will be searched while off the inmate's body." (SSF 130). It is a mandatory security measure over which the inmate has no control. (SSF 39–44). During a strip search, an inmate is required to remove his clothing in a private area. (*Id.*). The inmate is directed to manipulate his body so that it may be visually scanned, and his clothing is searched. (Id.).

Here, even if Byrd was "visually scan[ned]" incident to a security walk, that observation bears none of the hallmarks of a strip search under MCSO policy. No officer directed Byrd to use the shower or toilet, required him to remove his clothing, or ordered him to manipulate his body. (SSF 36). If Byrd was observed naked incident to a security walk, it was because he chose to remain naked by failing to use privacy safeguards. (*See* SSF 26, 30, 32, 51–52, 56, 58, 70, 80–82, 91). Any observation incident to a security walk was not tantamount to a strip search under MCSO policy. And even if it violated MCSO policy, "there is no § 1983 liability for violating prison policy." *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009). Under the totality of the circumstances, the challenged observation is reasonable under *Bell*. The Court should grant summary judgment on Count 2.

**b)    The challenged observation is valid under *Turner*.**

Under *Turner*, courts consider: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." 482 U.S. at 89–90. Evaluation of

the *Turner* factors should be done with deference to "the informed discretion of corrections officials." *Id.* at 90.

First, the challenged opposite-sex observations were incident to security walks, performed to promote the legitimate penological interest in inmate safety and institutional security. (SSF 23). This interest satisfies *Turner*'s first prong.

Second, Byrd retained numerous "alternative means" to exercise his right to privacy through the use of privacy safeguards. (*See* SSF 26, 30, 32, 51–52, 56, 58, 70, 80–82, 91). Although on appeal the Ninth Circuit stated in dicta that this prong "is not relevant," they did so without a record. *See Byrd v. Maricopa Cnty. Bd. of Supers.*, 845 F.3d 919, 924 n.1 (9th Cir. 2017); *id.* at 924 ("Without a response from the defendants, we cannot adequately assess the *Turner* factors."). These "alternative means" satisfy *Turner*'s second prong.

Third, the MCSO has already "accommodat[ed]" privacy rights with these safeguards. Through discovery, Byrd asked about the impact of adding certain privacy features not present in the Three Frank. Nearly all would negatively impact jail administration.

- Adding a "privacy screen or curtain" would negatively impact jail financial resources because the current privacy wall would need to be removed for the screen/curtain's installation. (SSF 103–105). It would negatively impact inmate privacy because officers would be required to "pull back/aside the curtain" to check on inmate wellbeing. (*Id.*). A rod hanging the shower curtain could be misused as a weapon. (*Id.*). It could be damaged, difficult to replace, and leave inmates exposed until it is fixed. (*Id.*).

- Adding a "suitable opaque or translucent material" under the stairs would provide inmates a hiding place for weapons and other contraband. (SSF 106–09). Officers would be required to spend more time near the shower area searching for contraband, increasing the length of security walks, increasing the likelihood of seeing an inmate naked, increasing the threat to officer safety, and creating "downstream effects" on the ability to perform security walks in other pods. (*Id.*). It would also increase danger to

officers by creating an inmate hiding space, and would make it harder to see inmates in distress behind the staircase. (*Id.*). It would be easy to damage and difficult to replace. (*Id.*).

- Adding "an intercom speaker" near the showering area would be costly, risk electrical shock, and duplicate the four speakers in the pod though which announcements are already made. (SSF 110–11).

- "[R]eversing the direction of the detention officers' routine security walk[s]" would have no impact on inmate safety or institutional security, but it would not increase inmate privacy because "regardless of what direction the detention officer walks, inmates would still be visible in the day room, the showers, or their cells, for security reasons." (SSF 112–13).

These "accommodations" negatively impact jail administration and/or have no net positive effect on inmate privacy compared with available privacy safeguards. "If accommodations for a constitutional right would cause significant changes within the prison environment, the courts should give deference to the prison officials who are responsible for safe, effective, and efficient administration of the prison system." *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004). The MCSO policy satisfies the third *Turner* prong.

Fourth, the MCSO's policy was not an exaggerated response to inmate safety and institutional security. Byrd must show that there are "obvious, easy alternatives" to the MCSO policy. *See Turner*, 482 U.S. at 90–91. This is not a "least restrictive alternative" test. *Id.* Here, there is no easy, effective alternative to observation incident to security walks. (SSF 103–13). Three Frank housed among the MCSO's most dangerous inmates. (SSF 19, 105). Observation incident to a security walk was necessary for inmate safety and institutional security. (SSF 23). "If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation." *Bahrampour*, 356 F.3d at 976. Thus, the MCSO's policy satisfies *Turner*'s fourth prong.

On balance, the challenged opposite-sex observation satisfies *Turner*. *See also Kirkpatrick*, No. CV 16-00287-PHX-JJT (BSB), at *10–*12. The Court should grant summary judgment on Count 2.

**C.     Defendants did not violate Byrd's 14th Amendment right to privacy [Count 3].**

**1.     If observation is a 4th Amendment "search," then the 14th Amendment's right to privacy is inapplicable.**

The Ninth Circuit has "[a]ssum[ed]" that inmates retain a 14th Amendment substantive due process right to bodily privacy by their "interest in not being viewed naked by members of the opposite sex." *Grummett*, 779 F.2d at 494. But "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841–44 (1998). If the Court concludes that the challenged observation is a 4th Amendment "search," the Court should grant summary judgment on Count 3.

**2.     The challenged observation did not violate Byrd's 14th Amendment right to privacy.**

Byrd alleges Defendants violated his right to bodily privacy. (Doc. 102, ¶¶ 173–75). This claim is subject to the same *Turner* analysis as his 4th Amendment claim. *See Michenfelder*, 860 F.2d at 333–34. Byrd's failure to satisfy *Turner* under the 4th Amendment thus dooms his 14th Amendment claim. (*See* Section I.B.2, *supra*).

The record also allays the Ninth Circuit's prior concerns on appeal. The challenged observation did not violate the MCSO's strip search policy. (Section I.B.1., *supra*); *see Byrd*, 845 F.3d at 924. And the challenged observation is distinguishable from *Sepulveda v. Ramirez*, 967 F.2d 1413 (9th Cir. 1992). *See Byrd*, 845 F.3d at 924. In *Sepulveda*, a male parole officer "ordered" a female parolee to produce a urine sample. 967 F.2d at 1415. The parole officer then "walked into the stall where [the parolee] was partially unclothed and seated on the toilet," and the officer refused to leave when the parolee

asked him to. *Id.* Here, in contrast, opposite-sex observation was incidental to security walks and officers did not order Byrd to do anything. Byrd retained numerous privacy safeguards not afforded to the parolee. (*See* Section I.B.1, *supra*). And the officers' view incidental to a brief security walk is distinguishable from the parole officer's prolonged view from in the bathroom stall. The Court should grant summary judgment on Count 3.

### D. Defendants did not punish Byrd under the 14th Amendment [Count 4].

Byrd alleges Defendants violated his right to be free from cruel and unusual punishment. (Doc. 102, ¶¶ 176–88). Officers may be liable for cruel and unusual punishment if they "acted with deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. The plaintiff must show that the restriction is "arbitrary or purposeless" for the court to "infer that the purpose of the governmental action is punishment." *Id.* "[T]he effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Id.* at 540.

Here, Byrd has relied on five disputed grievances he allegedly submitted to the Jail and his prior case against the County to show Defendants' deliberate indifference to his heightened sensitivity to opposite-sex observation. (*See* Doc. 102, ¶¶ 63–77). Assuming Byrd could establish Defendants' knowledge of his sensitivity, it would not show deliberate indifference. Defendants granted Byrd—the person in the best position to understand his heightened sensitivity—numerous privacy safeguards. (*See* Section I.B.1, *supra*). Byrd failed to use them and remained naked. (*Id.*). Nor can he show that the challenged observation was "arbitrary or purposeless": opposite-sex observation was incidental to security walks for inmate safety and institutional security. (SSF 23, 29). The challenged observation does not "constitute unconstitutional punishment, even if [it is] discomforting and are restrictions that the detainee would not have experienced had he

been released while awaiting trial." *Bell*, 441 U.S. at 540. The Court should grant summary judgment on Count 4.

### E.    Byrd has no additional substantive due process claim [Count 5].

Byrd's Count 5 substantive due process claim duplicates his Count 3 claim under the 14th Amendment's right to bodily privacy. (Doc. 102, ¶¶ 173–75, 189–93). Although Byrd also complains about the MCSO's grievance system, "[t]here is no legitimate claim of entitlement to a grievance procedure." *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988). The Court should grant summary judgment on Count 5.

### F.    Byrd's derivative § 1985(3) and § 1986 claims fail [Counts 6 and 7].

Byrd alleges Defendants entered a conspiracy to deprive him of the equal protection of law. (Doc. 102, ¶¶ 194–203). Section 1985 creates a civil action for damages caused by two or more persons who "conspire . . . for the purpose of depriving" the injured person of "the equal protection of the laws, or of equal privileges and immunities under the laws" and take or cause to be taken "any act in furtherance of the object of such conspiracy." 42 U.S.C. § 1985(3). But the intracorporate-conspiracy doctrine bars Byrd's conspiracy claim because "the allegation is that an entity conspired with its employees to violate an individual's constitutional rights." *See Donahoe*, 869 F. Supp. 2d at 1074–75. Neither the Supreme Court nor the Ninth Circuit has decided whether the doctrine applies in civil rights cases. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867–68 (2017) (granting qualified immunity because intracorporate liability was not clearly established); *Fazaga v. Federal Bureau of Investigation*, 2019 WL 961953, at *33 (9th Cir. 2019) (same). But this Court and others in this Circuit "consistently have held that it does apply." *Norton v. Arpaio*, No. CV-15-00087-PHX-SPL, 2015 WL 13759956, at *5 (D. Ariz. Nov. 20, 2015) (collecting cases).

Alternatively, the Court should grant summary judgment on Counts 6 and 7 because Defendants did not violate Byrd's rights in Counts 1 through 5. Without a valid § 1983 claim, Byrd has no § 1985(3) claim. *See Thornton*, 425 F.3d at 1168. And without a valid § 1985(3) claim, Byrd has no § 1986 claim. *See Trerice v. Pedersen*, 769 F.2d 1398,

1403 (9th Cir. 1985).

Even if Byrd could proceed with a § 1983 claim, § 1985(3) requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Discriminatory animus "implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271–72 (1993). The Ninth Circuit has implicitly extended § 1985(3) to sex-based discrimination against men. *See Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir. 1985) (extending § 1985(3) to "quasi-suspect classification[s]").

Here, there was no "discriminatory animus." (*See* Section I.A., *supra*). Opposite-sex observation was incidental to security walks for inmate safety and institutional security. (*Id.*). Male and female inmates were subject to opposite-sex observation incident to security walks, and the MCSO afforded them numerous privacy safeguards. (*Id.*). The limited difference between maximum security male and female inmates—the shower curtain in Estrella Jail beginning in 2018—is not relevant to Byrd's claim and does not show animus against men but a desire to address the special problem of women who would otherwise expose their breasts to the control tower officer. (*Id.*). Indeed, lower classification male inmates also received shower curtains. (*Id.*). The Court should grant summary judgment on Counts 6 and 7.

**G.     Even if the MCSO's policy violated Byrd's federal rights, the individual defendants are entitled to summary judgment [Counts 1–7].**

**1.     The individual defendants are entitled to qualified immunity.**

Qualified immunity shields government officials from money damages unless a plaintiff shows that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 231–232 (2009). The Court may tackle either prong first. *See id.* at 236.

The Court should grant all individual defendants summary judgment on Counts 1 through 7 because they did not violate Byrd's rights. (*See* Sections I.A.–I.F., *supra*).

Even if Defendants violated Byrd's rights, those rights were not "clearly established." A right is not "clearly established" "unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). "'[E]xisting precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* "[T]he right allegedly violated must be established, not as a broad general proposition, . . . but in a particularized sense . . . ." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (citations and internal quotation marks omitted). This is an "objective standard; the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1073 (9th Cir. 2012) (internal quotation marks omitted).

Here, the contours of Byrd's alleged constitutional rights were not "clearly established" in 2014. No Supreme Court case addresses the issue of opposite-sex observation of inmates—let alone one addressing the circumstances "confronted by" the individual defendants. Assuming *arguendo* that Ninth Circuit precedent "could be a dispositive source of clearly established law," *Reichle*, 566 U.S. at 665–66, that precedent (a) fails to address these circumstances or (b) supports the individual defendants' conduct. Indeed, the Court's screening order at the onset of this case dismissed Byrd's claims without leave to amend based on that precedent. (*See* Doc. 19 at 3–6).

*Grummett*'s discussion of "infrequent and casual observation, or observation at a distance" does not address the question confronted by the individual defendants because the Ninth Circuit approved the conduct of female guards; the case does not provide guidance for what female officers cannot do. *See* 779 F.2d at 494–95; *see also Watison v. Carter*, 668 F.3d 1108, 1113 (9th Cir. 2012) (summarizing *Grummett*'s holding as "prison's policy allowing female guards to observe male inmates disrobing, showering, using the toilet, and being strip-searched . . . did not amount to 'the type of shocking and

barbarous treatment protected against by the [E]ighth [A]mendment'"). Further, the "right's contours" were not "sufficiently definite" under the circumstances of this case because *Grummett* did not discuss privacy safeguards like those afforded by the MCSO. For example, unlike MCSO's inmates, the inmates in *Grummett* were locked in the shower area, unable to leave. *See* 779 F.2d at 492.

*Michenfelder* upheld the role of female officers in "shower duty." 860 F.2d at 334. *Somers*—the last case to address qualified immunity for opposite-sex observation in jail— stated that the Ninth Circuit had never "held that guards of the opposite sex are forbidden from viewing showering inmates." 109 F.3d at 620. And an Arizona district court judge recently upheld opposite-sex observation incident to security walks. *Kirkpatrick*, No. CV 16-00287-PHX-JJT (BSB), at *9–*12. The "constitutional question" is not "beyond debate."

Byrd's sex discrimination claim fares no better. Supreme Court precedent permits men and women to be treated differently "in certain circumstances." *Michael M.*, 450 U.S. at 469. No Supreme Court or Ninth Circuit precedent "clearly establishes" that male and female inmates must be treated identically in these circumstances during opposite-sex observation in the shower area or cells. Indeed, relevant Ninth Circuit precedent discusses "the differences between men and women." *See Somers*, 109 F.3d at 623–24; *Jordan v. Gardner*, 986 F.2d 1521, 1525–1526 (9th Cir. 1993). That discussion—while possibly anachronistic—further undermines any argument that Byrd's equal protection rights were "clearly established." And intracorporate conspiracy liability was not "clearly established" in 2014, barring Counts 6 and 7. *Abbasi*, 137 S.Ct. at 1867–68. The Court should grant all individual defendants summary judgment on Counts 1 through 7.

### 2. Byrd cannot show that the individually-named officer defendants personally participated in the violation of his rights.

If Byrd's claims survive qualified immunity analysis, he cannot show "personal participation by the defendant[s]." *See Taylor*, 880 F.2d at 104. In Count 1, Byrd cannot show that any named Female Officers, Grievance-Receiving Officers, or Grievance

Partners worked at the Jail and Estrella Jail in 2014, knew about any alleged different treatment, and/or personally participated in discrimination directed toward him, or that any Jail Supervisors or Grievance Supervisors "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *See Taylor*, 880 F.2d at 1045. Nor can he show that any individual defendants acted with discriminatory intent when they performed security walks, supervised subordinates, and/or took part in—or didn't take part in—the grievance process.[5] *See Thornton*, 425 F.3d at 1167.

In Counts 2 through 5, Byrd cannot show that any named female individual defendants personally participated in particular security walks that violated his 4th or 14th Amendment rights, or that any Jail Supervisors or Grievance Supervisors "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *See Taylor*, 880 F.2d at 1045. Nor, under Count 4, can he show that any defendants "acted with deliberate indifference to a substantial risk of serious harm." *See Frost*, 152 F.3d at 1128. Under Counts 6 and 7, Byrd cannot show that any defendants entered any agreement to deprive him of his rights on the basis of his sex.

**II.   Defendants did not violate Arizona law.**

**A.   Byrd's state law claims against the County and the Sheriff fail.**

**1.   Byrd cannot maintain state law claims against the County for alleged violations by the Sheriff and his employees.**

The County is not liable for state law claims against the Sheriff or his employees. The Sheriff has sole authority to "[t]ake charge of and keep the county jail . . . and the prisoners in the county jail." A.R.S. § 11-441(A)(5). Under well-settled principles of Arizona law, a county is not liable for state law claims against a sheriff or his employees because the county cannot control their actions. *See, e.g.*, *Fridena v. Maricopa Cnty.*, 504 P.2d 58, 61 (Ariz. Ct. App. 1972) (holding a "County, having no right of control over the

---

[5]   Byrd's allegations about the grievance process do not show individual liability for any individual defendants because he has no right to a grievance process. *See Mann*, 855 F.2d at 640; *Cousins*, 568 F.3d at 1070.

1  Sheriff or his deputies . . . is not liable under the doctrine of respondeat superior for the

2  Sheriff's torts").

3         This principle stems from Arizona's municipal separation of powers because the

4  Arizona Constitution and statutory law (a) create counties separate from county officers,

5  Ariz. Const. art. XII, § 1 (counties); Ariz. Const. art. XII, § 3, 4 (county officers); (b)

6  provide county boards of supervisors with sole authority to exercise the counties' powers,

7  A.R.S. § 11-201; and (c) do not provide counties or boards of supervisors authority over

8  jail administration or the power to control the actions of sheriff's employees, *see* A.R.S. §

9  11-201 (counties' powers); A.R.S. § 11-251 (boards' powers); *Hounshell v. White*, 202

10  P.3d 466, 470 (App. 2008) (concluding board of supervisors has no authority to remove or

11  discipline a sheriff's employee under the merit protection statutes). The Court should

12  grant the County summary judgment on Counts 8 through 15 even if they survive the

13  defects described below. *See e.g.*, *Norton*, 2015 WL 13759956, at *6 (dismissing state law

14  claims against county because state law "appear[s] to bar all state-law claims against a

15  county for the acts of a sheriff's department").

16         **2.**      **Sheriff Penzone is entitled to absolute immunity under A.R.S. §**

17              **12-820.01(A)(2).**

18         To the extent Byrd challenges MCSO policy, the Sheriff is absolutely immune

19  under state law because Byrd challenges a "determination of fundamental governmental

20  policy." *See* A.R.S. § 12-820.01(A)(2). Arizona law provides "[a] public entity"[6] absolute

21  immunity for "acts and omissions of its employees constituting . . . [t]he exercise of an

22  administrative function involving the determination of fundamental governmental policy."

23  *Id.* Section 12-820.01(B)(1) and (2) define "fundamental governmental policy" to include

24  (1) "[a] determination of whether to seek or whether to provide the resources necessary

25  for" "purchase of equipment," "construction or maintenance of facilities," "hiring of

26  personnel," and "[t]he provision of governmental services"; and (2) "A determination of

27  ─────────────

28  [6]   If the Court rejects Defendants' argument that the County is not liable for Byrd's state law claims, then this argument also applies to the County's lack of liability.

whether and how to spend existing resources, including those allocated for equipment, facilities and personnel." Absolute liability is narrowly construed. *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 217 P.3d 1220, 1242 (Ariz. Ct. App. 2009). "[C]ourts have distinguished high-level policymaking decisions, which include promulgating rules and regulations, from operational decisions, which more often involve day-to-day implementation of a regulatory scheme." *Id.*

Here, Byrd challenges the MCSO's policy of permitting opposite-sex observation incident to security walks and the adequacy of privacy afforded to inmates. (*See* Doc. ¶¶ 29–31). These high-level policymaking decisions follow the Sheriff's administrative authority under A.R.S. § 11-441(A)(5). The decisions constitute determinations of fundamental governmental policy, implicate the expenditure of resources, use of personnel, and provision of governmental services, and the Sheriff is absolutely immunity for them. *See, e.g.*, *Laya v. Pima Cnty., Ariz.*, No. CV 06-458 TUC DCB, 2009 WL 10688033, at *13 (D. Ariz. July 22, 2009). The Court should grant summary judgment on Counts 8 through 15.

### 3. The individual defendants are entitled to qualified immunity for any operational decisions, precluding the Sheriff's derivative liability.

To the extent the Sheriff cannot claim absolute liability under § 12-820.01(A) because Byrd's state law claims implicate operational decisions, the state law claims are precluded under common-law qualified immunity. Common-law qualified immunity applies when "officials are setting policy or performing an act that inherently requires judgment or discretion." *Chamberlain v. Mathis*, 729 P.2d 905, 909 (1986).

> Qualified immunity protects government officials from liability for acts within the scope of their public duties unless the official knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights.

*Id.* at 912 (citation omitted).

Here, the individual defendants did not violate Byrd's rights or commit tortious

21

conduct. (Sections I.A.–I.F., *supra*; Sections II.B. and C, *infra*). But even if they did, nothing in Arizona law establishes (a) an inmate's privacy or equal protection rights or (b) that conducting opposite-sex observation is tortious or unlawful. (Sections II.B. and C, *infra*; Section I.G.). Because there is no liability for the individual defendants, there is no "derivative liability" for the Sheriff.[7] *See Chaney Bldg. Co. v. City of Tucson*, 716 P.2d 28, 31 (Ariz. 1986). The Court should grant summary judgment on Counts 8 through 15.

**B.  Byrd's state constitutional claims fail [Counts 8–11].**

**1.  Byrd cannot bring a private cause of action for alleged violations of Article II, Sections 4, 8, 13, and 15 of the Arizona Constitution.**

Byrd cannot bring a private cause of action for alleged violations of Sections 4, 8, 13, and 15 of Article II of the Arizona Constitution. (*See* Doc. 102, ¶¶ 207–15). Under Arizona law, state constitutional provisions are not privately enforceable "unless from their context they are plainly self-executing." *See Bd. of Supers. of Yavapai Cnty. v. Stephens*, 177 P. 261, 263 (Ariz. 1918). This doctrine rests on the history of state constitutions, which began by "establishing a mere framework of government and securing certain fundamental rights to the people," but were later "drafted upon a different principle and have frequently, in many particulars, been deliberately prepared as a code of laws intended to operate directly upon the people without the necessity of further legislative action." *Miller v. Wilson*, 129 P.2d 668, 670 (1942). The "presumption" for early provisions is that "legislation was necessary to carry [them] into effect," whereas provisions are presumed "self-executing if, by their terms, it is apparent that such was the intent of their framers." *See id.*

A constitutional provision is not self-executing if "it merely lays down general principles." *Miller*, 129 P.2d at 670. A provision is self-executing if it "attempts to supply a sufficient method whereby the rights which it grants may operate without the aid of further legislative enactment," *id.*, or expressly states that it is. *See, e.g.*, Ariz. Const. art.

---

[7]   If the Court rejects Defendants' argument that the County is not liable for Byrd's state law claims, then this argument also applies to the County's lack of liability.

4, pt. 1, § 1(16) ("This section of the constitution [on referendum power] shall be, in all respects, self-executing."). Only if a constitutional provision is self-executing can it be enforced on its own without ancillary legislation to make it actionable. *See Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1107 (Ariz. Ct. App. 2004).

Here, Byrd asserts four claims directly under the Arizona Constitution. In Count 8, Byrd relies on Article II, Section 13, which states "[n]o law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. II, § 13. In Count 9, Byrd relies on Article II, Section 8 under which "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. II, § 8. In Count 10, Byrd relies on Article II, Section 15, which prohibits the "inflict[ion]" of "cruel and unusual punishment." Ariz. Const. art. II, § 15. And in Count 11 he relies on Article II, Section 4, which states that "[n]o person shall be deprived of life, liberty, or property without due process of law." Ariz. Const. art. II, § 4.

Defendants are unaware of any published decision by Arizona's courts holding that a plaintiff can maintain a private cause of action for an alleged violation of Article II, Sections 4, 8, 13, or 15. These provisions do not state they are self-executing, and they do not provide detail or the manner on how they should be enforced. These provisions "merely lay down general principles" that cannot "be put into operation" on their own. The Court should grant summary judgment on Counts 8 through 11.

        **2.**        **Defendants did not violate the Equal Privileges Clause [Count 8].**

Even if Byrd could sue under Arizona's Equal Privileges Clause, Ariz. Const. art. II, § 13, Arizona courts use the same standard as federal law. *City of Tucson v. Wolfe*, 917 P.2d 706, 707 (Ariz. Ct. App. 1995). Because Byrd cannot show a violation of the federal Equal Protection Clause, (Section I.A., *supra*), he cannot show a state law violation. The Court should grant summary judgment on Count 8.

        **3.**        **Defendants did not violate the Right to Privacy Clause [Count 9].**

Even if Byrd could sue under Arizona's Right to Privacy Clause, Ariz. Const. art.

II, § 8, no Arizona decision has applied it to prohibit opposite-sex observation of inmates in jail or even expressly applied its protections in jail. Further, the text of this provision—protecting "private affairs" and "home[s]"—precludes its application to showering and using the toilet in jail, particularly in the circumstances of this case.

Little of life in jail is like home, and even less is private. *Lanza v. State of N.Y.*, 370 U.S. 139, 143 (1962) ("[I]t is obvious that a jail shares none of the attributes of privacy of a home . . . . In prison, official surveillance has traditionally been the order of the day."). In other contexts, Arizona's right to privacy is largely coterminous with the Fourth Amendment's prohibition against unreasonable searches. *See, e.g.*, *State v. Johnson*, 207 P.3d 804, 810 (Ariz. Ct. App. 2009). But "[n]o Arizona appellate court has selected the appropriate method for assessing the viability of a law that infringes on a fundamental right protected by our constitutional privacy provision." *Standhardt v. Super. Ct. ex rel. Cnty. of Maricopa*, 77 P.3d 451, 455 n.5 (Ariz. Ct. App. 2003). In the absence of guidance from Arizona's courts, this Court should not extend Article II, Section 8 to circumstances not covered by its text. *See, e.g.*, *Turley v. State*, 59 P.2d 312, 316–17 (1936) (expressly reserving "the right" to construe Article II, § 8 "notwithstanding [its] analogy to the Federal Constitution and the federal decisions based on that Constitution").

Even if Byrd's Article II, Section 8 right mirrors his Fourth Amendment right, his failure to show a violation of his federal right, (Section I.B., *supra*), means he cannot show a state law violation. The Court should grant summary judgment on Count 9.

### 4. Defendants did not violate the Cruel and Unusual Punishment Clause [Count 10].

The Arizona Constitution prohibits the "inflict[ion]" of "cruel and unusual punishment." Ariz. Const. art. II, § 15. The focus of Arizona courts' jurisprudence under that prohibition is on the death penalty. *See, e.g.*, *State v. Bush*, 423 P.3d 370 (Ariz. 2018). Defendants are unaware of any published Arizona decision setting forth the "cruel and unusual punishment" standard for a pretrial detainee's conditions of confinement, and no decision has applied this provision to opposite-sex observation in jail. As a result, Byrd

1    cannot argue that the federal standard applies. Even if it did, the failure of his federal

2    claim dooms this claim. (*See* Section I.D., *supra*). The Court should grant summary

3    judgment on Count 10.

### 5.    Defendants did not violate the Due Process Clause [Count 11].

5    Arizona's Due Process Clause states that "[n]o person shall be deprived of life,

6    liberty, or property without due process of law." Ariz. Const. art. 2, § 4. Arizona courts

7    have stated their "review of equal protection and substantive due process claims are

8    conceptually similar, with the level of scrutiny dependent upon the classification or right

9    at issue." *State v. Coleman*, 385 P.3d 420, 423 (Ariz. Ct. App. 2016) (internal quotation

10   marks omitted). Defendants are unaware of any published Arizona decision establishing a

11   pretrial detainee's "substantive due process" rights—let alone his right to privacy—and no

12   decision has applied this provision to opposite-sex observation in jail. As a result, Byrd

13   cannot argue that the federal standard applies. Even if it did, Byrd's failure to show a

14   violation of federal law defeats this claim. (*See* Section I.C., *supra*). The Court should

15   grant summary judgment on Count 11.

### C.    Byrd cannot maintain his state law tort claims [Counts 12–15].

### 1.    Byrd has no claim for negligence [Count 12].

18   To show negligence, a plaintiff must prove: (1) "a duty requiring the defendant to

19   conform to a certain standard of care"; (2) "a breach by the defendant of that standard";

20   (3) "a causal connection between the defendant's conduct and the resulting injury"; and

21   (4) "actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (2007). "But a public official

22   performing a discretionary act encompassed within her public duties is shielded from

23   liability for simple negligence." *Spooner v. City of Phoenix*, 2018 WL 6217055, at *3, ¶

24   10 (Ariz. Ct. App. 2018). Byrd's simple negligence claim thus fails. (*See* Doc. 102, ¶¶

25   216–19).

26   Even if the Court construed Byrd's claim as one for gross negligence, nothing in

27   Arizona law establishes a duty to protect an inmate from opposite-sex observation

28   incident to a security walk in jail. Byrd also cannot supply this Court with pathmarking

Arizona cases to identify a standard of care or an expert to show that Defendants breached this new-found standard of care. Instead, the privacy safeguards necessarily met the standard of care. (*See* Section I.B.1, *supra*). And there is no "proof of objective malice" by Defendants. *See Chamberlain*, 729 P.2d at 913. The Court should grant summary judgment on Count 12.

### 2. Defendants did not commit Intentional Infliction of Emotional Distress [Count 13].

Under Arizona law, a claim of intentional infliction of emotional distress has three elements: (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from this conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon*, 734 P.2d 580, 585 (Ariz. 1987). The Arizona Supreme Court has stated that there is liability

> where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community . . . in which . . . an average member of the community would exclaim, "Outrageous!"

*Id.* (quoting Restatement of Torts § 46, cmt. d).

Here, even if this Court assumes, as it must at this stage, that Byrd submitted the five disputed grievances, the opposite-sex observation incident to security walks is not "so outrageous" or "so extreme" as to be tortious. Any observation was incidental to security walks for the safety and security of inmates and the institution. (SSF 23, 29). Inmates like Byrd with unique sensitivities have numerous privacy safeguards. (*See* Section I.B.1, *supra*). By failing to use those safeguards, Byrd exposed his naked body to the public. (*See, e.g.*, SSF 91 (stating Byrd did not cover himself with a towel because the towel would "get all wet")). It is not "utterly intolerable in a civilized community" that a pretrial detainee who fails to cover himself up will be seen by detention officers—including female detention officers. The Court should grant summary judgment on Count 13.

### 3. Defendants did not enter a civil conspiracy [Count 14].

Under Arizona law, civil conspiracy is a "derivative tort." *Rowland v. Union Hills Country Club*, 757 P.2d 105, 110 (Ariz. Ct. App. 1988). "For a civil conspiracy to occur two or more persons must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Id.* Arizona courts have recognized the intracorporate conspiracy doctrine. *See id.* ("A corporation cannot conspire with itself . . . ."). And "a claim for civil conspiracy must include an actual agreement, proven by clear and convincing evidence." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 37 (Ariz. 2002).

Here, there is no underlying tort. (*See* Sections I.A.–F., II.B. & C., *supra*). The intracorporate conspiracy doctrine bars liability. And nothing—let alone clear and convincing evidence—shows an agreement to commit a tort. The Court should grant summary judgment on Count 14.

### 4. Defendants did not aid and abet tortious conduct [Count 15].

Under Arizona law, a plaintiff alleging aiding and abetting tortious conduct must prove three elements: (1) "the primary tortfeasor must commit a tort that causes injury to the plaintiff"; (2) "the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty"; and (3) "the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Wells Fargo*, 38 P.3d at 23. "[A]iding and abetting liability is based on proof of scienter . . . defendants must *know* that the conduct they are aiding and abetting is a tort." *Id.* "[A]n inference of knowledge will not be made lightly." *Frederico v. Maric*, 226 P.3d 403, 405 (Ariz. Ct. App. 2010). Here, there is no underlying tort. (*See* Sections I.A.–F., II.B. & C., *supra*). Defendants cannot have known that opposite-sex observation incident to security walks was tortious. (Section II.A.3.). The Court should grant summary judgment on Count 15.

## III. Byrd cannot obtain all the relief he seeks.

### A. Byrd's injunctive relief claims are moot.

Byrd's claims for injunctive relief under federal and state law are moot because he

27

is no longer in custody. Mootness is an issue of federal law arising from Article III's "cases and controversies" requirement. *See Alvarez v. Hill*, 667 F.3d 1061, 1063–64 (9th Cir. 2012). Byrd cannot rely on differences in Arizona law to avoid that command on his state law claims. *E.g.*, *Kondaur Capital Corp. v. Pinal Cnty.*, 330 P.3d 379, 382 (Ariz. Ct. App. 2014). Federal law controls the availability of injunctive relief.

"An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action." *Alvarez*, 667 F.3d at 1064. Neither mootness exception is applicable here. First, an exception exists for claims that are "capable of repetition, yet evade review." *Id.* This exception is "limited to extraordinary cases" where: (1) "the duration of the challenged action is too short to be fully litigated before it ceases"; and (2) "there is a reasonable expectation that the plaintiff will be subjected to the same action again." *Id.* A released inmate cannot claim a reasonable expectation that he will return to custody and be subjected to the challenged jail policies and conditions because "[t]hat possibility . . . is too speculative a basis." *Id.*

The second exception applies where it is unlikely that the inmate "will be subjected to the same alleged harm in the future," but he is "challenging ongoing policies to which others will continue to be subject." *Alvarez*, 667 F.3d at 1065 (citing *United States v. Howard*, 480 F.3d 1005, 1009–10 (9th Cir. 2007)). The Ninth Circuit has never applied the *Howard* exception "beyond such circumstances involving short-lived pretrial problems in criminal prosecutions," like courtroom shackling. *Alvarez*, 667 F.3d at 1065. No judge in this Circuit has extended the *Howard* exception to conditions of confinement claims. *Cf. Gialloreto v. Wash. Cnty.*, No. 3:15-cv-02343-SB, 2016 WL 8229040, *3–*4 (D. Ore. Nov. 17, 2016) (collecting cases). Here, Byrd is no longer in MCSO custody. (SSF 6). *Alvarez* forecloses applicability of an exception, and Byrd's claims for injunctive relief are moot. The Court should grant summary judgment on Byrd's request for injunctive relief on all counts.

**B.      Punitive damages are unavailable to Byrd.**

It is well-established that Byrd cannot maintain a federal claim of punitive damages against the County. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). But punitive damages may be available against individual defendants under § 1983 and § 1985(3) "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983) (§ 1983); *White v. Wash. Pub. Power Supply Sys.*, 692 F.2d 1286, 1290 (9th Cir. 1982) (§ 1985(3)). Here, the individual defendants were not "motivated by evil motive or intent" and did not show "reckless or callous indifference" to Byrd's constitutional rights. Any opposite-sex observation was incidental to security walks for inmate safety and institutional security, (SSF 23, 29), and Byrd retained numerous privacy safeguards, (*see* Section I.B.1, *supra*). The individual defendants are entitled to qualified immunity because Byrd's rights were not clearly established. (Section I.G.). Further, Byrd cannot show any "personal participation" of the individual defendants in the violation of his equal protection or privacy rights. (*Id.*).

Separately, under Arizona law, "[n]either a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages." A.R.S. § 12-820.04. The Court should grant summary judgment on Byrd's requests for punitive damages under Counts 1 through 15.

### Conclusion

For the foregoing reasons, the Court should grant summary judgment on Counts 1 through 15. Defendants did not violate federal or state law by permitting opposite-sex observation of male inmates incidental to security walks for inmate safety and institutional security.

**RESPECTFULLY SUBMITTED** this 13th day of March, 2019.

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY:   /s/ Joseph J. Branco
          JOSEPH J. BRANCO, ESQ.
          CHARLES TRULLINGER, ESQ.
          TALIA J. OFFORD, ESQ.
          Attorneys for Defendants Maricopa
          County, Sheriff Paul Penzone, and the
          Individually-Named Detention Personnel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2019, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and served on counsel of record via the Court's CM/ECF system.

Jacob C. Jones
David G. Barker
Snell & Wilmer LLP
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, AZ 85004
jcjones@swlaw.com
dbarker@swlaw.com
*Attorneys for Plaintiff*

Christopher J. Berry, Esq.
BERRY LAW GROUP, PLLC
1850 North Central Avenue, Suite 1150
Central Arts Plaza
Phoenix, AZ 85004
cberry@berrylawgroup.com
*Attorneys for Defendants Arpaio, Olson and Sheridan*

/s/ M. Delgado